Filed 4/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VICTOR TUNG,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHICAGO TITLE COMPANY et al.,<br><br>    Defendants and Respondents. | A151526<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-13-531599) |

Victor Tung sued various parties, including Chicago Title Company and Maureen Dullea, a Chicago Title Company escrow officer (respondents), for damages and to rescind the sale of his two-unit residence in San Francisco. After resolving the case with all the other defendants and rescinding the sale, Tung sought to recover as damages against respondents the attorney fees he spent in securing and quieting his title due to the rescinded sale, attorney fees he incurred defending against his possible eviction from the property, the rent he paid to live in the property before the sale was rescinded, and rental income he lost for the time he was off title.

The trial court granted a motion in limine made by respondents and ruled that Tung could not offer evidence of the attorney fees he paid because they were not specifically alleged as an item of his damages. He was also not permitted to offer evidence of the rent he paid, his lost rental income or fees incurred defending against his unlawful detainer actions because they were

too speculative.  Tung's motion to amend to allege attorney fees as damages was denied by the trial court as untimely and because it was prejudicial to respondents.  Since the ruling excluded all evidence of the most significant damages Tung sought from respondents, the parties agreed the ruling was the functional equivalent of a nonsuit or judgment on the pleadings. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27 (*Edwards*).)  We reverse.

In addition, we caution trial judges to be wary when choosing to decide an in limine motion that, no matter how captioned, functions as a nonstatutory motion for judgment on the pleadings, particularly when the motion is filed on the eve of trial.  Doing so, under circumstances like those presented here, is a recipe for reversal.

## FACTUAL HISTORY

With the standards of review in mind, we draw the relevant details of the factual background from Tung's second amended complaint at issue in this case, and facts that arose during discovery.

Tung owned a two-unit residential building in San Francisco, located at 714–716 Monterey Boulevard (the property).  In August 2012, he listed the property for sale with " 'New Horizon Realty dba JRT' " (New Horizon) and Wendy Lo.  Lo had represented Tung in previous real estate and loan transactions.  Unbeknownst to Tung, Lo was no longer a licensed real estate broker because her license had been revoked in 1998 following her conviction of several felonies, which include loan and mail fraud in connection with real estate and loan transactions.  After Lo's license was revoked, she continued to act as a real estate broker under different names to conceal her identity.  Lo would create a corporate entity (in this case New Horizon) and use it to

2

obtain a corporate real estate license. She would then hire a "rent-a-broker" and use this person's license as a cover for broker activities carried out by Lo herself.

In January 2013, Lo presented Tung with a one-page document he believed was a purchase offer for the property. It turned out the document was an addendum to a purchase agreement that had been created without Tung's knowledge and bore his forged signature. The transaction closed escrow and Tung was to be responsible for payment of a broker's commission on the sale evidenced by his promissory note in Lo's favor for $24,960.

Tung sued to rescind the sale and for damages against the buyer, Amy Qi,[1] the realtors involved, and respondents Chicago Title Company and Chicago Title Company escrow officer Maureen Dullea. The basis for rescission was that Tung was misled into selling the property for less than the balance on an existing mortgage when, in fact, a greater amount was paid by the buyer than Tung knew and the amount in excess of the mortgage balance was secretly paid to Tung's realtor.

Tung's second amended complaint alleged causes of action against the buyer, Qi, and Tung's realtors for declaratory relief and cancellation of the written agreements surrounding the sale, rescission, quiet title and cancellation of the deed, rescission of the purchase agreement, breach of fiduciary duty, and fraud. In addition to rescission, Tung sought damages, punitive damages and attorney fees as costs of suit.

---

[1] Qi and Lo were longtime friends and Qi had used Lo's address as her own for several years. In addition, Lo had represented Qi in prior real estate transactions beginning in 2006.

3

Two separate causes of action were alleged against respondents. The eighth cause of action for breach of fiduciary duty alleged that as escrow holders, respondents failed to use reasonable skill and diligence by preparing vague, ambiguous, and incomplete escrow instructions and then closing escrow without seeking clarification or complying with the terms of the instructions. Respondents also allegedly breached their fiduciary duty by failing to ensure Tung's agent, Lo, had a valid real estate license. This cause of action sought "damages in excess of the jurisdictional minimum of [the] court in an amount to be established according to proof," contractual attorney fees based upon Civil Code section 1717, and punitive damages.

The ninth cause of action against respondents was for fraud and deceit alleging respondent Dullea intentionally prepared the grant deed for the transaction in a way that concealed the buyer's unmarried status from Tung when he was relying on the buyer's husband as a source of assets to complete the transaction. It also repeated the allegation about ambiguous and incomplete escrow instructions, alleged Dullea failed to provide Tung copies of all the transaction documents, and that she altered a promissory note and deed of trust to reduce the amount owed to Tung in ways that varied from the escrow instructions. Tung also alleged Dullea closed the transaction without the approval of Tung's ex-wife and coborrower on his mortgage, even though her approval was a condition of closing. This cause of action sought "general and special damages in an amount in excess of the jurisdictional minimum of [the] Court to be established according to proof at trial," and punitive damages.

The prayers for relief on the eighth and ninth causes of action were essentially identical. Each sought compensatory damages according to proof,

punitive damages, an award of attorney fees and costs, and for such other relief as the court deemed appropriate.

When the case was called for trial in August 2016, Tung and the purchaser, Qi, agreed to rescind the sale and settle their dispute. Tung also settled with another of the realtors involved in the transaction. Consequently, trial was to go forward against the remaining defendants, respondents Chicago Title Company and its agent Maureen Dullea, and Lo, Tung's unlicensed realtor.

The respondents moved in limine to exclude certain evidence supporting Tung's damages claims. Respondents' motion in limine No. 10 sought to exclude all evidence of unpled or resolved claims for damages. This motion was brought alternatively as a nonstatutory motion for judgment on the pleadings. In substance, respondents considered certain items of damage to be speculative and unforeseeable, specifically $162,000 in rental income for the upper unit of the property that Tung claimed he lost while title to the property was contested, Tung's payment of $7,500 in rent so he could remain living in the property while title was contested, and attorney fees Tung incurred defending against his eviction from the property during the same period. Respondents also challenged Tung's failure to plead, as an item of his damages, the attorney fees he incurred in rescinding the sale.

The trial court ruled that neither the rent paid by Tung to Qi while he remained in the property following the sale, the attorney fees he incurred in defending against eviction proceedings, nor the rental income he lost while he did not have title to the property were foreseeable items of damage that could be recovered from respondents. Although the court considered the attorney fees Tung incurred to recover title to the property a foreseeable element of

5

damages, the court determined his failure to plead them as such was fatal to his ability to seek them at trial.

Immediately following the trial court's ruling, Tung's counsel (Ms. McGill) orally asked for leave to amend to plead attorney fees as damages as to the quiet title claim. Ms. McGill argued she was aware of no case specifying that "you have to be more specific with regard to attorneys' fees as damages than any other item of damages," and that there was "no surprise" because "throughout this case, throughout discovery [we clarified] that we were, in fact, seeking attorneys' fees as damages against the title insurance company and provided extensive discovery on that issue . . . ."

The day following the court's ruling, Ms. McGill filed a written motion for leave to amend Tung's second amended complaint to allege tort of another damages. These included, among other things, attorney fees incurred by Tung to clear title to the property. In light of the last-minute nature of the amendment and alleged prejudice to respondents, the motion was denied.

The cumulative effect of these rulings left Tung with only two items of direct damages to recover from respondents—$5,800 for transfer taxes and $200 in escrow fees that were paid due to the rescinded sale. In light of the reduced prospects for a significant recovery against respondents, Tung agreed to withdraw the direct damage claims to facilitate his appeal of the adverse rulings on the motion for judgment on the pleadings. Tung also stipulated to an award of contractual fees and costs against him in the amount of $280,000 in favor of Chicago Title Company, to be stayed pending the appeal. The outcome of this appeal will determine whether Tung must pay this stipulated fee award.

Based on Tung's withdrawal of his remaining damages claims, the court granted respondents' motion for judgment on the pleadings and awarded judgment on the eighth and ninth causes of action in favor of Chicago Title Company and Dullea.

Tung timely appealed.

## DISCUSSION

### I. *Motion for judgment on the pleadings*

#### A. *Standard of review*

At trial, respondents filed several motions in limine essentially objecting to any and all evidence of specific items of damages on the ground Tung's pleadings were fatally defective and had failed to state a cause of action against them. As such, these motions operate the same way as does a general demurrer or a motion for judgment on the pleadings.

Under these circumstances, the scope of the trial court's inquiry is relatively narrow. "Both a demurrer and a motion for judgment on the pleadings accept as true all material factual allegations of the challenged pleading, unless contrary to law or to facts of which a court may take judicial notice. The sole issue is whether the complaint, as it stands, states a cause of action as a matter of law. [Citations.] The scope of a trial court's inquiry on a motion for nonsuit is similarly limited. A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Edwards*, *supra*,

7

53 Cal.App.4th at pp. 27–28.)  Under the record presented, we are bound by the same rules as the trial court.

### B.  Foreseeability of "loss of use" damages by an escrow holder

" 'An escrow involves the deposit of documents and/or money with a third party to be delivered on the occurrence of some condition.' [Citations.] An escrow holder is an agent and fiduciary of the parties to the escrow.  [Citations.]  The agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow.  [Citations.]  If the escrow holder fails to carry out an instruction it has contracted to perform, the injured party has a cause of action for breach of contract." (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711.)  "An escrow holder must comply strictly with the instructions of the parties.  [Citation.] . . . [I]f the escrow holder acts negligently, 'it would ordinarily be liable for any loss occasioned by its breach of duty.' " (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 531–532.)

As stated earlier, the eighth and ninth causes of action against respondents seek damages for their alleged breach of fiduciary duty due to closing escrow when not authorized by the instructions, and for fraud and deceit by allegedly altering the deed and loan documents in order to deceive Tung about the amount of the sale price and the identity of the purchaser. "An essential element of each of these claims is that a defendant's alleged misconduct was the cause in fact of the plaintiff's damage.  [Citations.] [¶] The causation analysis involves two elements.  ' "One is *cause in fact*.  An act is a cause in fact if it is a necessary antecedent of an event." [Citation.]' [Citation.]  The second element is proximate cause.  ' "[P]roximate cause 'is

8

ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.' " ' " (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102–1103, fn. omitted.)

The trial court excluded several items Tung sought as loss of use damages he claimed to have suffered due to respondents' actions, including (1) rent Tung paid Qi so he could continue living in the property, (2) money Tung paid to an attorney to defend him against eviction actions brought by Qi, and (3) the loss of rent paid by tenants on the second floor of the property to Qi instead of him. In explaining its decision, the trial court stated it was excluding these damages because they were not foreseeable, having been caused by the "independent acts" of Qi and Tung "having nothing to do with [respondents'] activities." The court apparently felt it was not foreseeable as a matter of law that (1) Tung would not move out of the building, (2) his failure to do so would trigger Qi's eviction actions against him, and (3) Qi would receive and keep rent from the tenants in the upper unit for herself.

We start with the familiar concepts related to proximate cause and the foreseeability of intervening independent acts. "Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable." (9 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1348.)

9

"The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred. Thus, where there is an independent intervening act that is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause. Rules of legal cause, therefore, operate to relieve the defendant whose conduct is a cause in fact of the injury, where it would be considered unjust to hold him or her legally responsible." (9 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1335.)

"To determine whether an independent intervening act was reasonably foreseeable, we look to the act and the nature of the harm suffered. [Citation.] To qualify as a superseding cause so as to relieve the defendant from liability for the plaintiff's injuries, both the intervening act and the results of that act must not be foreseeable. [Citation.] Significantly, 'what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.' [Citation.] Whether an intervening force is superseding or not generally presents a question of fact, but becomes a matter of law where only one reasonable conclusion may be reached." (*Chanda v. Federal Home Loans Corp.* (2013) 215 Cal.App.4th 746, 755–756.) Stated another way, although proximate cause is generally held to be a question of fact for the jury, "[o]ccasionally . . . on undisputed facts, the question is regarded as one of law." (9 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1333.)

Based on the very nature of the service provided by an escrow company and its agents, it seems inevitable that if either engaged in tortious conduct, such conduct, if proven, has the potential of resulting in conflicting claims

10

between the escrow clients over the possession and ownership of the subject property. Our task at this juncture is to decide whether the trial court erred by deciding it was legally unforeseeable to respondents that Tung would suffer loss of use damages at the hands of Qi following the close of escrow by respondents. Essentially, we consider whether this is one of those "occasional" cases where foreseeability may be decided by the trial court as a question of law. We conclude it is not.

In considering whether the damages suffered by Tung were legally foreseeable to respondents, the trial court narrowly focused only on certain facts. For example, the court believed it was very unusual that Tung chose to keep living at the property in the face of eviction proceedings, observing that Tung was compelled to pay rent only because he refused to move out—all of which the court believed would be legally unforeseeable to respondents.

Although arising in a different context (action brought by mortgage lender against a mortgage broker for negligence and breach of fiduciary duty after discovering the loan they had financed had been obtained through fraud and forgery), *Chanda v. Federal Home Loans Corp.*, *supra*, 215 Cal.App.4th 746 (*Chanda*) is helpful on this point.

In *Chanda*, there was evidence that a mortgage broker allowed a notary public to obtain the necessary signatures on loan documents in the broker's absence. Apparently, the notary had forged these signatures. The mortgage broker asked the court to instruct the jury on superseding causes, arguing it was unforeseeable that a notary would commit forgery. The trial court refused to do so. (*Chanda*, *supra,* 215 Cal.App.4th at p. 756.) On appeal, the court said, "To determine whether the independent intervening act was reasonably foreseeable, we look to the act and the nature of the harm

11

suffered. [Citation.] To qualify as a superseding cause so as to relieve the defendant from liability for the plaintiff's injuries, both the intervening act and the results of that act must not be foreseeable. [Citation.] Significantly, 'what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.' [Citation.] Whether an intervening force is superseding or not generally presents a question of fact, but becomes a matter of law where only one reasonable conclusion may be reached." (*Id.* at pp. 755–756.)

In its analysis, the *Chanda* court concluded that the mortgage broker's assertion it was unforeseeable a notary would commit forgery was "viewing the facts too narrowly. The general character of the event, the submission of forged loan documents was highly foreseeable. [Citation.] . . . Finally, the result of that event, the [plaintiffs'] loss of their investment, was also highly foreseeable." (*Chanda, supra,* 215 Cal.App.4th at pp. 756–757.)

The same is true here. It may not be common for a buyer and seller of property to become embroiled in a quiet title action where the seller refuses to move out and faces eviction proceedings brought against him by the putative buyer. However, in the face of alleged tortious conduct by an escrow holder (as is the case here), it is foreseeable that a buyer might seek to capitalize on the escrow holder's errors or misconduct, making it necessary for a seller to bring legal action to resolve conflicting claims over who has the right to possession of the property. As with most issues related to foreseeability, it is a question of fact for a jury—not the court.

## II. *Tung's motion to amend the second amended complaint*

We next address the trial court's denial of Tung's motion to amend the second amended complaint to allege attorney fees as damages.

12

## A.  *Standard of review*

We review a motion to amend a complaint under Code of Civil Procedure section 473 for an abuse of discretion.  "[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown." (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 135.)  Statutes like section 473 are "construed liberally so that cases might be tried upon their merits in one trial where no prejudice to the opposing party . . . is demonstrated." (*Rainer v. Community Memorial Hospital* (1971) 18 Cal.App.3d 240, 254.)  Further, this liberal policy applies to amendments " 'at any stage of the proceedings, up to and including trial,' " absent prejudice to the adverse party.  (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.)

## B.  *Applicable law*

In reviewing the trial court's denial of Tung's motions to amend, a brief discussion of the applicable law giving rising to Tung's request is necessary to provide context.  In *Prentice v. North American Title Guaranty* (1963) 59 Cal.2d 618*,* 619 (*Prentice*), the California Supreme Court addressed whether in a quiet title action attorney fees may be awarded to a seller of land because of the negligence of a paid escrow holder.

Citing the general rule that in the absence of a special agreement or statutory provision, attorney fees are to be paid by the party employing the attorney, the court recognized an exception.  "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and

13

other expenditures thereby suffered or incurred." (*Prentice, supra*, 59 Cal.2d at p. 620.) More specifically, "[w]hen a paid escrow holder has, as in this case, negligently made it necessary for the vendor of land to file a quiet title action against a third person, attorney's fees incurred by the vendor in prosecuting such action are recoverable as an item of the vendor's damages in an action against the escrow holder." (*Id.* at p. 621.) Further, there is no reason why recovery should be denied "simply because the two causes (the one against the third person and the one against the party whose breach of duty made it necessary for the plaintiff to sue the third person) are tried in the same court at the same time." (*Ibid.*)

*Prentice* makes it clear that where attorney fees under these circumstances are incurred and sought as damages, they need to be alleged in the pleadings, which the plaintiff in *Prentice* did not do. However, the plaintiff's failure to do so was overlooked because "the issue was thoroughly tried and understood by counsel and the court, and no prejudice has resulted to defendant from a failure to allege the damage more specifically in the complaint." (*Prentice, supra*, 59 Cal.2d at pp. 621–622.)

In this case, the second amended complaint did not allege Tung was seeking *Prentice* damages. Instead, as previously noted, Tung alleged he sustained "damages in excess of the jurisdictional minimum of [the] court in an amount to be established according to proof" (¶ No. 115), contractual attorney fees based upon Civil Code section 1717 (¶ No. 116), and punitive damages (¶ No. 118). We will assume, without deciding, that this was insufficient to satisfy the pleading requirements described in *Prentice.*

The question then becomes whether respondents, like in *Prentice,* understood that Tung was seeking *Prentice*-type damages and, if so, whether

14

they suffered prejudice due to Tung's failure to allege these damages more specifically in the second amended complaint.

In her written motion to amend filed on September 2, 2016, Tung's counsel, Ms. McGill, sought to amend the complaint to allege tort of another damages, which included attorney fees incurred during the quiet title action. She argued that such an amendment would not prejudice respondents because they were "fully aware" of Tung's claim for damages which had been "fully disclosed in discovery."

In support of this argument, Ms. McGill pointed out several instances during discovery which show that Dullea's counsel had notice of Tung's intention to pursue attorney fees as damages.[2] These include two sets of form interrogatories propounded by Dullea's counsel upon Tung on January 17, 2014 and December 2, 2014, referring to form interrogatory No. 9.1, which asked about "any other damages that you attribute to the INCIDENT?" and, if so, to explain. In a verified response to both sets of form interrogatories, Tung answered:

"Yes. I have incurred attorney fees to clear title to my property and to retain possession of my property. My attorney on the title issues is Michele McGill. Fees and expenses are ongoing and I do not have a total. My attorney defending me against Ami Qi's eviction attempts is Brenda Cruz Keith. Fees and expenses are ongoing and I do not have a total. I have also incurred miscellaneous expenses including rental amounts paid to Ami Qi

---

[2] Dullea was represented during discovery proceedings by different counsel than who represented her at trial. Mr. Trapani was Dullea's trial counsel (as well as trial counsel for Chicago Title Company). He represents both respondents on appeal.

and loss of use and rental for 714 Monterey Blvd. I do not presently know the amounts."

A second example offered by Ms. McGill includes special interrogatories propounded by Dullea's counsel on Tung dated December 2, 2014. Interrogatory No. 12 asked Tung to "[s]tate all damages supporting YOUR Eighth Cause of Action for Breach of Fiduciary Duty against MAUREEN DULLEA, including the basis of your calculation." In a verified response, Tung stated he "has incurred substantial attorney fees and costs in this matter in the attempt to regain ownership and control of his property."

Ms. McGill references yet another example. Tung responded to Dullea's "Request for Production of Documents, Set One," on February 5, 2015, in which counsel for Dullea demanded that Tung produce billing statements to support his damage claim. In response, Tung produced various billing statements. After doing so, Tung's counsel responded to further inquiries made by Dullea's counsel related to Tung's damages claims.

Ms. McGill provided evidence that on May 19, 2015, counsel for Dullea wrote: "Thank you for providing the updated responses to Special Interrogatory No. 31 and some of the additional documents. The attorney's fee billing statements from your office are still missing from the production. Does this mean that your client does not intend to claim your fees as part of his damage claim? Please advise whether this is the case. If your client still intends to include the attorney's fees incurred in this action as damages, please provide the billing statements by Friday, May 22, 2015."

On the same day, Ms. McGill responded: "All billing statements were provided and they are redacted for privileged and attorney work product. The redactions are white spaces where words used to be."

16

Counsel for Dullea wrote back: "I do see your billing statements, however there is only a total number of hours billed without a total fee amount and cost of other charges. This is still inadequate to indicate the amount of total damages your client is claiming for your fees and costs. Please provide the total attorney's fees charged for the 342.25 hours through April 9, 2015 as well as the costs that are claimed for the services provided."

Tung also points out that during his deposition, which was taken on June 29, 2015, he was questioned about his attorney fees and costs "paid and incurred in this action as well as the attorney fees and costs paid and incurred to the Law Office of Brenda Cruz Keith to defend him in the eviction action . . . ."

After being made aware of this information, the trial court asked counsel for respondents, Mr. Trapani, to clarify "exactly what" they were unaware of with respect to Tung's claim for attorney fees as damages. In doing so, the court referenced Mr. Trapani's claim of prejudice made the day before that there was "some degree of surprise" due to counsel being unaware of Tung's claim "to the attorneys fees as relates to the unlawful detainer."

In response to the court's question, Mr. Trapani did not state that he was unaware of the nature of the damages claim. Instead, counsel essentially claimed respondents had been prejudiced because they had not designated an expert witness to testify about the reasonable value of the attorney fees incurred due to the eviction and quiet title actions. Mr. Trapani argued that the prejudice his clients suffered was similar to that in *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359 (*Duchrow*), where the court held it was an abuse of discretion to allow amendment of a complaint midtrial to

17

allege a new theory of liability because, until the amendment, the client had not needed to retain an expert.

Ms. McGill responded by explaining that attorney fees as damages have "been a part of the case for the last couple of years" and that she had not been aware of "this pleading problem until Mr. Trapani filed his motion, which was three days before trial . . . ." She distinguished *Duchrow* arguing that there the attorney sought to amend the complaint five days into trial to allege a new theory of liability. Ms. McGill pointed out that she and counsel for Dullea (not Mr. Trapani) had "talked specifically about what kind of discovery that would allow [referring to attorney fees as damages] and based on that, she convinced me I would have to produce my bills normally. That would always wait until the end of the case for a [Civil Code section] 1717 attorneys' fee type of analysis." Ms. McGill explained that the "only reason that bills were being produced in the middle of the case . . . and that questions were being asked about attorneys' fees . . . is because [respondents] were aware . . . through discovery that we were claiming attorneys' fees as damages for the limited purpose of regaining title and unduly [*sic*] the damage that happened at close of escrow."

During this same time, the court was considering Tung's August 25, 2016 motion in limine No. 8 to "Bifurcate Issue of Attorney Fees As Damages" (motion in limine No. 8), which the court described as being a somewhat interrelated motion in limine, presumably referring to respondents' motion in limine No. 10 to "Preclude Admissibility at Trial of All Evidence of Unpled and/or Resolved Claims for Damages" (motion in limine No. 10).

18

In motion in limine No. 8, Ms. McGill stated that she had asked Mr. Trapani whether he would reconsider his decision to have the amount of attorney fees determined by the jury and, instead, stipulate that the issue of attorney fees as damages be submitted to the court as is the "usual method." Ms. McGill advised Mr. Trapani that if he would agree to stipulate, the issue of liability and damages could be bifurcated. Mr. Trapani did not agree and "insisted that the amount of attorney fees be determined by the jury and stated that he opposed bifurcating the issue." Apparently, since Mr. Trapani was unwilling to stipulate, Ms. McGill asked the court to bifurcate liability from proceedings to determine the amount of attorney fees as damages, arguing this would "alleviate any undue prejudice to either party, and confusion, that the attorney fee issue presents."

The trial court ultimately denied Tung's motion to amend. In doing so, the court recognized "a liberal policy of permitting amendment of a complaint at the time of trial, unless there is prejudice or surprise." In explaining her decision, the court concluded that respondents had been misled by relying on the reference in the second amended complaint to Civil Code section 1717, "which is in that paragraph in the complaint and no further elaboration of it." The court agreed that expert testimony would be necessary and that there would have to be a "pretty substantial" delay and "some serious financial costs." On balance, the court concluded "the calculus falls not in favor for permitting the amendment."

Even a cursory review leaves little doubt the second amended complaint did not clearly plead Tung's intent to claim attorney fees as damages against respondents. Our analysis, however, does not end at this point. In recognition of the liberal policy of permitting amendment of a

19

complaint even at trial, we must next consider what evidence, if any, supports the trial court's conclusion that respondents were prejudiced and/or surprised by this pleading defect. In doing so, we consider, among other things, whether "the issue was thoroughly tried and understood by counsel" and whether respondents were prejudiced by this pleading failure. (*Prentice*, *supra*, 59 Cal.2d at p. 621.)

We conclude there is significant evidence that Dullea's prior counsel was very aware of Tung's intent to pursue attorney fees as damages and sought through discovery to clarify the amount of such attorney fees as damages in both the quiet title and eviction actions.[3] As detailed earlier, Ms. McGill presented evidence of discovery propounded by respondent Dullea's counsel to obtain information about these damages. There is evidence that counsel asked Ms. McGill for additional billing statements for clarification. Dullea's counsel discussed billing by Ms. McGill for fees Ms. McGill incurred related to the quiet title action and for fees incurred by Ms. Cruz Keith, for defending Tung in the eviction proceedings. Tung was deposed and asked questions about his attorney fees incurred in the quiet title action as well as in the eviction action. The billing records were included as an exhibit to the deposition. In the face of this evidence, we cannot conclude there is support for the trial court's conclusion that respondents were surprised by Tung's intent to pursue attorney fees as damages because the issue had been

---

[3] Although the record does not reflect the name of counsel for respondent Chicago Title Company during discovery, if not Mr. Trapani, we believe it is highly unlikely that discovery conducted by Dullea's prior counsel would not have been available to Chicago Title Company's then counsel and ultimately to Mr. Trapani.

discussed between counsel and was the subject of discovery for an extended period of time.

We next consider whether respondents would have been prejudiced by the court granting Tung's motion to amend the second amended complaint. Mr. Trapani argued to the trial court that Tung was attempting to amend to state a new theory of liability and that if this were allowed, respondents would be severely prejudiced. More specifically, counsel pointed out that Tung did not list a "witness expert to talk about the attorneys fees or about the reasonableness of attorneys' fees." Likewise, respondents did not list an expert witness because "we related those [attorney fees] back to what was actually pled," suggesting respondents' counsel would have handled the case differently if attorney fees had been alleged as damages. Counsel then said he started to wonder "about the whole *Prentice* issue," ultimately leading to his decision to file a motion for judgment on the pleadings.

In respondents' appellate brief, Mr. Trapani alleges that "[i]f allowed, the amendment might have permitted Mr. Tung to seek damages instead of restitution. In contract [*sic*], the complaint sought a restitutionary-type recovery. . . . [T]he Respondents' defense was simple: since the transaction had been reversed and Mr. Tung had received 'complete relief' from Ms. Qi, he was not entitled to any award of damages against the Respondents. *Duchrow*, *supra*[, 215 Cal.App.4th] at [page] 1380."[4]

---

[4] We do not follow respondents' arguments that Tung's second amended complaint sought a "restitutionary-type recovery" against respondents *or* that Tung had already received complete relief from Qi so he was not entitled to any award of damages. To the contrary, Tung sought loss of use damages, legal fees incurred by Tung in defending the quiet title action and in defending against Qi's eviction actions, and accrued interest. We find

Respondents' brief goes on to state, "But under the midtrial amendment, Mr. Tung's theory of compensation turned on a number of other factors. So, the Respondents' defense required them to respond requests [*sic*] for damages that were never contemplated by Mr. Tung's complaints. In addition, with the amendment, the question whether Mr. Tung's attorneys actually spent the hours claimed on an action that was required by the alleged improper close of escrow would be a central issue, as would whether the time claims was [*sic*] a reasonable amount of time. *Duchrow, supra,* [215 Cal.App.4th at [page] 1380. Consequently, the amendment would introduce 'new and substantially different issues' to the case. *Duchrow*, at [page] 1380, citing *Trafton* [*v. Youngblood* (1968) 69 Cal.2d 17,] 31. Therefore, the amendment would raise 'new issues not included in the original pleadings.' *Duchrow*, [at page] 1380."

Respondents contend this analysis translates into prejudice to respondents in several ways. To explain respondents' theory of prejudice, we quote extensively from respondents' brief:

"First, it would have changed the recovery sought from restitution, as plead in the complaint, to damages. Furthermore, had the Respondents known about the new damages theories before the discovery cut-off date, the Respondents could have used one or more discovery methods to determine if the lawyers really had spent the hours on a lawsuit that was caused solely by a wrongful close of escrow. *Duchrow, supra*[, 215 Cal.App.4th] at [page] 1381.

---

nothing in the record to support respondents' theory or indicating the trial court relied upon this reasoning in making its ruling.

"The amendment would have entitled the Respondents to conduct discovery to determine the total number of hours the attorneys had spent on the prior suit and the specific tasks the attorneys had performed. *Duchrow, supra*[, 215 Cal.App.4th] at [page] 1381. Since a continuance would have been necessary to permit further discovery and the trial was already started, the motion to amend was properly denied. *Duchrow,* [at page] 1381 . . . .

"Additionally, the Respondents could have retained an expert on attorney fee awards, and called the expert as a witness at trial to testify about whether the amount claimed was a reasonable amount of attorney fees. *Duchrow*, *supra*[, 215 Cal.App.4th] at [page] 1381. . . .

"Next, if the Respondents had known earlier about the Appellant's new theory of recovery, they might have approached the trial and settlement negotiations differently. In addition, if the Appellant had made a timely motion to amend, the Respondents would have attacked the claim through pre-trial motions. *Duchrow*, *supra*[, 215 Cal.App.4th] at [page] 1381.

"Lastly, leave to amend is properly denied where the facts are not in dispute, and the nature of the Plaintiff's claim is clear, but under substantive law, no liability exists and no amendment would change the result. [Citation.] Here, since Mr. Tung was already afforded 'complete relief' in conjunction with the voiding of the contract, he was seeking to amend the complaint to allege an inappropriate duplicative recovery. . . . Furthermore, since he incurred the attorney fees in pursuing co-tortfeasors for their breaches, he was seeking to amend the complaint to allege fees which he could not recover from the Respondents. Therefore, his amendment was properly denied because it would not change the results. [Citation.]"

23

We begin by observing that, to the extent we understand respondents' argument and theory of prejudice, it is unclear whether all these theories were presented to the trial court, let alone that the court relied upon them, when denying Tung's motion to amend the second amended complaint. What is clear is that respondents have placed considerable weight on *Duchrow*, *supra*, 215 Cal.App.4th 1359. Consequently, we take a close look at that case to see whether it provides support for any of respondents' theories of prejudice.

The dispute between Mr. Duchrow and Ms. Forrest, both attorneys, originated as an employment law dispute where Mr. Duchrow represented Ms. Forrest. Duchrow withdrew from Forrest's case at the beginning of trial and the matter ended up being dismissed because Forrest could not find another attorney to represent her. (*Duchrow*, *supra*, 215 Cal.App.4th at pp. 1367–1369.)

Duchrow filed a lawsuit against Forrest alleging Forrest had breached the parties' retainer agreement, and sought damages and costs under paragraphs Nos. 5 and 7 of the agreement. (*Duchrow*, *supra*, 215 Cal.App.4th at pp. 1362, 1370.) The case went to trial. On the fourth day of a five-day jury trial, Duchrow was allowed to amend his complaint to allege a new theory of liability. (*Id.* at pp. 1363, 1373.) Under paragraph No. 9 of the retainer agreement (which was not mentioned in the complaint), Duchrow was able to recover for all time spent on the prior case because he had withdrawn for good cause. Forrest opposed the motion to amend contending (accurately) that this raised the amount of potential damages significantly and, if Forrest had known, she would have tried to find counsel instead of representing herself. (*Id.* at p. 1373.) The motion to amend was granted by

24

the trial court and the jury awarded Duchrow damages in excess of $140,000. Forrest appealed, alleging the trial court abused its discretion by granting the amendment.  (*Id.* at pp. 1374, 1376.)

The Court of Appeal agreed.  It stated:  "Duchrow offered no reason for the delay in seeking the amendment; the amendment changed the relevant facts and the theory of liability, significantly increasing the damages requested, warranting additional discovery and the use of an expert witness on attorney fee awards, making representation by counsel all the more important, and requiring research to determine the enforceability of paragraph 9; and the amendment resulted in prejudice."  (*Duchrow*, *supra*, 215 Cal.App.4th at p. 1376.)

We begin with the obvious factual differences between the subject case and the facts in *Duchrow* and how these differences impact any potential prejudice claims made by respondents.

First, Tung's counsel made a motion to amend—both orally and in writing—only after she realized the trial court intended to exclude all but a small amount of the damages that she was seeking against respondents, essentially gutting her case.  Although the case had been assigned out for trial, no jury had been selected or even called up.  In contrast, in *Duchrow*, the motion to amend was made and granted on the fourth day of a five-day jury trial against an unrepresented party.

Second, unlike in *Duchrow*, the evidence in the subject case demonstrates that respondents' prior counsel was fully aware of the nature of Tung's damage claims against respondents and, at the very least, that they included attorney fees related to the quiet title and eviction actions. Respondents' counsel was thus apprised of Tung's theory of the case even if it

25

was not well pled and the words "*Prentice* damages" were not used. Discovery had already been conducted on the nature and amount of attorney fees as damages which were incurred in connection with the quiet title-related action and eviction actions. In fact, Dullea's prior counsel specifically referred to these fees as "damages" herself and sought clarification from Tung's counsel as to the amounts, as would be expected during discovery. The evidence suggests that Tung's counsel, Ms. McGill, attempted to provide counsel answers to her requested clarifications. Unlike in *Duchrow,* therefore, Tung's motion to amend did not add a new theory of liability to the case; it merely sought to clarify what counsel for Tung and respondents' prior counsel had been aware of all along.

Respondents' current counsel, Mr. Trapani, initially suggested to the trial court that his clients were prejudiced because they did not know or were misled about whether attorney fees were being claimed as damages. However, counsel backed away from this argument and pivoted to a different theory of prejudice when confronted with evidence to the contrary by Tung's counsel. Respondents' theory of prejudice then focused on respondents having relied upon the pleadings and, as a result, not having named an expert witness to testify about whether the requested attorney fees were a reasonable amount.

In an effort to salvage the situation, as indicated in Tung's motion in limine No. 8, Ms. McGill wrote to Mr. Trapani and suggested that the case be bifurcated to first determine liability. Only if the jury found liability would the subject of attorney fees even become relevant. In addition, Ms. McGill asked Mr. Trapani to stipulate to having the trial court determine the amount of attorney fees, if any, thereby obviating any need for expert

26

testimony because the trial court is qualified to make such a determination. Mr. Trapani declined, insisting that any damages be decided by a jury even though he had no expert witness. Although respondents have the right to have a jury determine damages, if any, and the amount, counsel's refusal to stipulate suggests there was gamesmanship afoot, which is relevant in determining whether the respondents suffered any real prejudice.

Here, in stark contrast to *Duchrow*, respondents through their counsel had long been fully aware of the theory of liability upon which Tung was proceeding and the potential for an award of damages for attorney fees incurred by Tung in his effort to quiet title and avoid eviction. They were aware through discovery of the amount of damages being claimed and how the attorney fees had been incurred, and had ample opportunity to obtain clarification about those amounts. Unlike in *Duchrow*, the evidence did not support a finding that respondents were surprised or would be prejudiced by allowing Tung to amend his second amended complaint as requested.

Based on all these circumstances, we conclude the trial court erred in denying Tung's motion to amend.

### III. *Motions in limine and nonstatutory motions for judgment on the pleadings*

We briefly observe that the continued viability of nonstatutory motions for judgment on the pleadings, like motion in limine No. 10, is unclear. Since it is unnecessary for us to decide this issue, we merely flag it for future reference and to highlight potential pitfalls these motions often create for trial judges, as happened in this case.

To provide context, Code of Civil Procedure section 438 (added by Stats. 1993, ch. 456, § 5, pp. 2524–2527) (hereafter section 438), which became

27

effective January 1, 1994, imposes two significant limitations on bringing a motion for judgment on the pleadings. First, it may not be brought on grounds previously raised by demurrer unless there has been a material change in the law since the demurrer was overruled. (§ 438, subd. (g)(1).) This subdivision is not relevant to this appeal since respondents both filed answers to the second amended complaint. More importantly, section 438 contains a deadline which bars such motions from being made at the time of trial "unless the court otherwise permits." (§ 438, subd. (e).) As a result, motion in limine No. 10, which was filed on August 15, 2016 (14 days before trial), would have been untimely under section 438 unless the trial court chose to hear it anyway pursuant to section 438, subdivision (e).

Respondents have cited authority in support of nonstatutory motions for judgment on the pleadings which either pre-dates 1994, relies on case authority that pre-dates the enactment of section 438, or simply does not address the issue. For example, *Kortmeyer v. California Ins. Guarantee Assn.* (1992) 9 Cal.App.4th 1285, 1293, cited by respondents, was decided in 1992. *Stoops v. Abbassi* (2002) 100 Cal.App.4th 644, 650, which was decided in 2002, cites as authority *Ion Equipment Corp. v. Nelson* (1980) 110 Cal.App.3d 868, 877, which was published prior to the enactment of section 438. Further, although *Smiley v. Citibank* (1995) 11 Cal.4th 138 (*Smiley*), a Supreme Court case decided in 1995, acknowledges the existence of nonstatutory motions for judgment on the pleadings made by a defendant, it expressly does not address any impact section 438 might have on such a motion. (*Id.* at p. 145, fn. 2 ["We note in passing that, during the course of this action, section 438 was added to the Code of Civil Procedure dealing with motions for judgment on the pleadings . . . . Neither [party] has raised any

28

claim that either provision is pertinent to the conduct of the proceedings or to the outcome thereof."].)  "As we have repeatedly observed, ' "cases are not authority for propositions not considered." ' " (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.)

Even if nonstatutory motions for judgment on the pleadings are still viable post-section 438, which we need not decide, this case illustrates why trial judges should think twice before becoming ensnared in addressing them on the merits on the eve of trial where, especially like here, the operative pleading has never been challenged before.

At the outset, we question whether the subject matter of motion in limine No. 10 was appropriate for an in limine motion.  "In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial. . . . What [they] are *not* designed to do is to replace the dispositive motions prescribed by the Code of Civil Procedure.  It has become increasingly common, however, for litigants to utilize in limine motions for this purpose." (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593 (*Amtower*).)  *Amtower* observed that "[t]hese nontraditional in limine motions can result in a court's dismissing a cause on the pleadings.  (See, e.g., *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701–702 [trial court construed motions in limine as a motion for judgment on the pleadings and dismissed the action].)" (*Ibid.*)

*Amtower* further stated, "In purpose and effect, [these] nonstatutory procedures are merely substitutes for the dispositive motions authorized by statute.  Appellate courts are becoming increasingly wary of this tactic.  (See *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 371 (conc. opn. of Rylaarsdam, J.) ['To have the sufficiency of the pleading or

29

the existence of triable issues of material fact decided in the guise of a motion in limine is a perversion of the process.'].) The disadvantages of such shortcuts are obvious. They circumvent procedural protections provided by the statutory motions or by trial on the merits; they risk blindsiding the nonmoving party; and, in some cases, they could infringe a litigant's right to a jury trial. (Cal. Const., art. I, § 16.) Adherence to the statutory processes would avoid all these risks." (*Amtower*, *supra*, 158 Cal.App.4th at p. 1594.) We add our voice to the well-reasoned *Amtower* decision to point out that reversals may become necessary where these types of irregular procedures are employed by counsel late in the trial game. (See *ibid.*)

A nonstatutory motion for judgment on the pleadings, especially when made in the form of an in limine motion, places the trial court in the position of having to master the facts and theories of a complaint within a compressed time frame, usually while under the pressure of having a jury panel either waiting or on call. The trial court must do so without the benefit of written opposition from opposing counsel. For example, in this case, the trial court had to review a 36-page second amended complaint (not including attached exhibits), based on a convoluted set of facts alleging the existence of a bungled real estate transaction involving numerous claims premised on various theories affecting multiple parties. As when ruling on a demurrer, the court is required to consider only allegations contained within the complaint, which are presumed to be true, or facts of which it may take judicial notice. (*Edwards*, *supra*, 53 Cal.App.4th at pp. 27–28; *Smiley*, *supra*, 11 Cal.4th at p. 146.)

As a practical matter, this means the trial court must take special care to rely only on allegations made in the complaint—not the arguments of the

moving party. Motion in limine No. 10 asked the trial court to "preclude admissibility at trial of all evidence of unpled and/or resolved claims for damages." What allegations are even relevant to "resolved claims for damages," let alone actually pled in the second amended complaint?

As an example, motion in limine No. 10 made at least one argument based on allegations not contained in the second amended complaint. Respondents alleged that the putative buyer of the property "spent a considerable amount of money on MR. TUNG'S property, all without compensation by MR. TUNG. Therefore, rather than being harmed and damaged, MR. TUNG has been advantaged by the closing of escrow." Not surprisingly, no such allegation appears anywhere in the second amended complaint. To the contrary, paragraph No. 72, in apparent contradiction, states, "[Putative buyer] has made no payments for the property on or after May 2013."

Finally, if a trial court grants a nonstatutory motion for judgment on the pleadings, it needs to be prepared for the plaintiff's inevitable motion to amend. This request will inexorably be followed by the defendant's objection based on the grounds the motion to amend is untimely and the defendant will suffer prejudice if the motion to amend is granted "at this late date." The outcome of a trial court's ruling on this type of motion, under these circumstances, raises issues that are fraught with appellate peril.

Trial judges, the vast majority of whom are incredibly hard-working, should not feel compelled to have to decide these types of ersatz in limine/dispositive motions just because trial counsel asks them to do so. This is especially true where, like in this case, there is a defined statutory mechanism available in section 438, which places the legal burden not on the

31

trial court to do the moving party's work, but instead on trial counsel where it squarely belongs.

## DISPOSITION

The judgment on the pleadings is reversed. Pursuant to the parties' agreement, the stipulated award of fees and costs is likewise reversed. On remand, Tung may amend the second amended complaint to allege *Prentice* damages.[5] Tung is awarded his costs on appeal.

---

[5] We express no opinion about the propriety of any other potential amendments to the pleadings on remand.

WISEMAN, J.*


WE CONCUR:


FUJISAKI, Acting P.J.


PETROU, J.


A151526
*Tung v. Chicago Title Company*

     *Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:          Superior Court of the City and County of San Francisco

Trial Judge:          Hon. Cynthia Ming-Mei Lee

Counsel:

Law Office of Gerald Clausen, Gerald Clausen; Law Office of Michele L. McGill and Michele L. McGill for Plaintiff and Appellant.

Fidelity National Law Group and Thomas A. Trapani for Defendants and Respondents.